UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X

JEFFREY JOSEPH,

                    *Petitioner*,

                                           **Memorandum and Order**

            -*against*-

                                           18-CV-1877(KAM)
SUPERINTENDENT,                            19-CV-2250(KAM)

                    *Respondent*.

----------------------------------X

**KIYO A. MATSUMOTO, United States District Judge:**

        Jeffrey Joseph ("Petitioner" or "Mr. Joseph") filed

petitions in two cases that were consolidated, seeking a writ of

*habeas corpus* pursuant to 28 U.S.C. § 2254 ("Section 2254").[1]

Mr. Joseph challenges the constitutionality of his conviction in

New York state court of first degree manslaughter following a

jury trial.  For the reasons discussed below, Mr. Joseph's

petitions are DENIED and dismissed in their entirety.

---

[1] Mr. Joseph, acting *pro se*, brought his first petition in this court
on March 22, 2018.  (Case No. 18-cv-1877, ECF No. 1, Petition for a
Writ of *Habeas Corpus* ("Pet.").)  Mr. Joseph filed another petition,
through counsel, on June 21, 2018, which was consolidated with his
first petition and which this court will treat as though it were
supplemental to his first petition.  (Case No. 19-cv-2250, Petition
for a Writ of *Habeas Corpus* ("Supp. Pet.").)  His supplemental
petition focused on a single issue, and that issue was also raised in
his original petition.

## Background

### I.    The Shooting and Subsequent Investigation

On the evening of July 20, 2006, Illis Bryan ("the victim") was shot in Brooklyn, New York, and he died later that day during surgery as a result of the single gunshot wound. (Supp. Pet. at 2.)  It appears that the police went nearly a year without a suspect in the shooting, until April 2007, when Sean Rose ("Mr. Rose") told detectives, after being arrested, that he had information regarding the homicide.  (*Id.*)  Mr. Rose told police that on the night of the shooting, he saw Mr. Joseph in a fight in the area of the shooting, and then later saw Mr. Joseph heading back to the area just before he heard gunshots, at which point Mr. Rose saw the victim collapse to the ground. (*Id.* at 2-3.)  Mr. Rose identified Mr. Joseph in a photo array. (*Id.* at 3.)

Several months later, in September 2007, Kyle Leslie ("Mr. Leslie") was arrested, and he provided police with information about the homicide.  (*Id.*)  Mr. Leslie told police that he witnessed a fight in which Mr. Joseph got beaten up. (*Id.*)  Mr. Leslie said that he later saw Mr. Joseph return to the area, and shoot the victim after the victim attempted to punch him.  (*Id.*)  Like Mr. Rose, Mr. Leslie identified Mr. Joseph in a photo array.  (*Id.*)

2

In October 2007, Joshua Byrd ("Mr. Byrd") was in police custody after being arrested on charges related to a home invasion. (*Id.*) Mr. Byrd told police that Mr. Joseph shot the victim during a fight. (*Id.*) At that point in time, Mr. Byrd identified Mr. Joseph in a photo array. (*Id.*) In February 2009, Mr. Byrd identified Mr. Joseph in a live lineup. (*Id.* at 4.)

In April 2008, Petitioner was in police custody. (*Id.* at 3.) An undercover police officer, who later testified at trial, went into a cell next to Mr. Joseph's cell and struck up a conversation with him. (*Id.* at 3-4.) The undercover police officer testified that Mr. Joseph told him that he shot a person in a park after getting "into some words" with the person. (*Id.* at 4.) In June 2008, Mr. Joseph was indicted on charges of murder in the second degree, manslaughter in the first degree, and criminal possession of a weapon in the second degree. (*Id.*)

## II. The Trial and Conviction

Petitioner's trial began with jury selection in Kings County Supreme Court on June 16, 2010. (June 16, 2010 Transcript,[2] at 1.) Before jury selection began, the prosecution

---

[2] The transcripts of the jury selection and trial begin at ECF page number 152 of the collection of transcripts uploaded at ECF number 8-1 in case number 18-cv-1877. Throughout this Memorandum and Order, citations to transcripts of the state court proceedings cite the internal page number of each particular transcript, rather than the ECF page number from the filing of the transcript.

requested that it be allowed to introduce evidence of Mr. Joseph's alleged "gang affiliation," on the grounds that witnesses would testify that "the area where the homicide occurred at the time was controlled by [a] particular set of the Crips street gang," that the victim was a member of a "different faction" of the gang than was Mr. Joseph, and that the affiliation would "show[] why and how [the prosecution's] witnesses [were] familiar with" Mr. Joseph. (*Id.* at 19.) The trial judge ruled that such evidence would be "more prejudicial than probative," because there was "no evidence that the offense was due to gang affiliation"; rather, "it appear[ed] that what occurred was personal between [Mr. Joseph] and the victim." (June 17, 2010 Transcript ("June 17 Tr."), at 3.) The court further stated that whether Mr. Joseph and the victim were members of "different sects of the same gang [was] inconsequential without any indication [it] was a basis leading to the charged crime." (*Id.*) After jury selection was complete, the prosecution requested that the court revisit its ruling, but the court declined to change its ruling. (Trial Transcript ("Trial Tr."), at 2-3.)

Mr. Rose, who was the first person to provide information to the police regarding Mr. Joseph's involvement in the shooting, did not testify at the trial, but both Mr. Byrd and Mr. Leslie were called as witnesses by the prosecution.

4

On the afternoon of the first day of the prosecution's case, outside the presence of the jury and just before Mr. Byrd was scheduled to testify, the prosecutor noted on the record that "the courtroom just filled with [Mr. Joseph's] associates from his Crip street gang." (*Id.* at 79.)  The prosecutor, who had "been a gang prosecutor for almost three years," stated that "these individuals greet[ed] themselves in the hallway with a particular handshake that the Crips typically use with one another." (*Id.* at 79-80.)  The prosecutor argued that the presence of these supposed gang members was "a clear attempt to silence" Mr. Byrd. (*Id.*)  The prosecutor then argued that the testimony he wanted to elicit regarding Mr. Joseph's alleged gang affiliation "ha[d] to do with [Mr. Byrd's] relationship with [Mr. Joseph] and the jury [was] going to be sizing up [Mr. Byrd] and taking note of his demeanor." (*Id.* at 83.)  The court held an off-the-record sidebar with the prosecutor and defense counsel, and then Mr. Byrd's testimony proceeded. (*Id.* at 85.)

At various points during Mr. Byrd's testimony, in the presence of the jury, the prosecutor inquired about Mr. Byrd's and Mr. Joseph's alleged gang affiliation.  Mr. Byrd admitted that he was a member of the "Stone Cold Crips," which is a particular faction of the Crips gang. (*Id.* at 88-89.)  The prosecutor then asked Mr. Byrd about the spectators in the courtroom:

Q. Just want to point your attention to the
people in the audience here.

[Defense Counsel]: Objection.

Q. Are they also Crips?

[Defense Counsel]: Objection.

The Court: Sustained.

Q. Mr. Byrd, are you nervous about testifying
here today?

[Defense Counsel]: Objection.

The Court: Overruled.

A. No, I'm not.

. . .

Q. Where were you waiting prior to your testimony
here today?

A. Where was I waiting?

Q. Yes.

A. In the room outside in the hallway.

Q. Were you waiting there by yourself?

A. Yes.

Q. Did anybody approach that conference room?

[Defense Counsel]: Objection.

(*Id.* at 91-92.)  At that point, the judge held an off-the-record

sidebar with counsel, and excused the jury.  (*Id.* at 92.)  The

judge stated to the spectators that "all [were] welcome in this

courtroom," so long as they did not engage in "fidgeting or

hands that look like they are making signs." (*Id.* at 92-93.)
The jury was then welcomed back. (*Id.* at 93.)  The judge did
not provide a limiting instruction regarding to what extent the
jury could consider the alleged gang affiliation of Mr. Joseph
or any of the witnesses.

The prosecution continued questioning Mr. Byrd, and
Mr. Byrd confirmed that the victim was a member of the Crips
street gang. (*Id.*)  Mr. Byrd also testified that on the evening
of the shooting, he saw Mr. Joseph, who was "mad" and was
looking for the victim. (*Id.* at 109.)  Mr. Byrd testified that
he witnessed the victim attempt to punch Mr. Joseph, and then
Mr. Joseph shot the victim. (*Id.* at 112.)

In addition to Mr. Byrd, Mr. Leslie was also called as
a witness by the prosecution.  During Mr. Leslie's testimony,
the prosecutor asked about the alleged gang affiliation of the
spectators in the courtroom:

Q. Do you recognize anybody in the audience?

A. Yeah.

[Defense Counsel]: Objection.

The Court: Overruled.

Q. Members of the audience members of the Crips?

[Defense Counsel]: Objection.

The Court: Sustained.

Q. How do you feel about testifying here today.

[Defense Counsel]: Objection.

The Court: Overruled.

A. This is -- this is not something that I want to do, man.

Q. Are you uncomfortable?

A. Yeah.

[Defense Counsel]: Objection.

The Court: Sustained.

Q. How come you don't want to testify?

[Defense Counsel]: Objection.

The Court: Overruled -- sustained.

(*Id.* at 256-57.)  The court then allowed the prosecutor to have an *ex parte* conference with Mr. Leslie to determine whether Mr. Leslie was being intimidated.  (*Id.* at 269.)

Mr. Leslie continued to testify, and on cross-examination, he stated that he told the police that Mr. Joseph was involved in the shooting because the detective "wouldn't leave [him] alone" even though he "kept telling [the detective that he] wasn't there," so he "lied."  (*Id.* at 303-04.)  During the prosecution's redirect, Mr. Leslie testified that he "told [the detective] what he wanted to hear," and that he was "not there" during the shooting.  (*Id.* at 313.)  The prosecution noted that in 2007, Mr. Leslie provided the police a sworn statement about Mr. Joseph's involvement, and then stated:

> Q. And now in this courtroom in the presence of a
> whole bunch of Crips --
>
> [Defense Counsel]: Objection.
>
> The Court: Sustained.  Sustained.  That's
> stricken.  Disregard it.
>
> [Prosecutor]: I have nothing further, Judge.

(*Id.* at 300-01.)

The prosecution called several other witnesses, including Wilber Calliste, who witnessed an argument between Mr. Joseph and another individual before the shooting, and then heard gunshots, although he did not witness the actual shooting. (*See id.* at 337-38.)  The prosecution also called a detective to testify about the lineup during which Mr. Byrd identified Mr. Joseph.  (*See id.* at 379.)  During the detective's testimony, the prosecutor asked about the "nature of the case":

> Q. Did you know what type of case this was, what
> the nature of the case was?
>
> A. I just knew it was probably a gang case,
> originated in the gang bureau.
>
> The Court: Stricken.

(*Id.* at 378.)  Other than the judge ordering the testimony to be "stricken," no limiting instruction was given.

Mr. Joseph did not call any witnesses in his defense. His counsel moved for a mistrial, based on the prosecutor's reference to "a whole bunch of Crips" at the end of Mr. Leslie's testimony.  (*Id.* at 514-15.)  The court noted that the

prosecutor's statement was "improper," but found that it was about "the audience" in the courtroom rather than about Mr. Joseph. (*Id.* at 516.)  The court held that the statement did not rise "to the level of a mistrial." (*Id.* at 517.)

The jury found Mr. Joseph guilty of manslaughter in the first degree, and acquitted him of murder in the second degree and criminal possession of a weapon in the second degree. (*Id.* at 658-59.)  Mr. Joseph was sentenced to 20 years of incarceration, followed by five years of post-release supervision. (Sentencing Transcript, at 24.)

### III. Subsequent Procedural History

Mr. Joseph appealed his conviction to the New York Appellate Division, Second Department, arguing that (1) he was denied due process as a result of the prosecution's references to alleged gang affiliation, (2) the photo array used by witnesses to identify Mr. Joseph during the investigation was unduly suggestive, and (3) the court should have instructed the jury as to the lesser-included offense of second-degree manslaughter. (*See* Supp. Pet. at 12.)  Mr. Joseph also argued, in a *pro se* supplemental brief, that (4) the court did not give a proper readback of Mr. Byrd's testimony to the jury during its deliberations, and (5) his trial counsel was ineffective for not

requesting a *Sirois* hearing[3] following Mr. Leslie's change in testimony.  (*Id.*)  On December 21, 2016, the Appellate Division, Second Department affirmed the trial court's judgment.  *See People v. Joseph*, 145 A.D.3d 916, 917 (2d Dep't 2016). Petitioner applied for leave to appeal to the New York Court of Appeals, and his application was denied on March 27, 2017.  *See People v. Joseph*, 29 N.Y.3d 949 (N.Y. 2017).

On March 22, 2018, Mr. Joseph timely filed a *pro se* petition for a writ of *habeas corpus*.  (Case No. 18-cv-1877, Pet.)  Mr. Joseph's petition raised the same five grounds for relief that he raised in his appeal to the Appellate Division: (1) the photo array used by witnesses to identify Mr. Joseph was unduly suggestive, (2) the court should have instructed the jury regarding the lesser-included offense of second-degree manslaughter, (3) the prosecution's references to alleged gang affiliation violated due process, (4) the court did not give a proper readback of Mr. Byrd's testimony to the jury, and (5) his trial counsel was ineffective for not requesting a *Sirois* hearing.  (*See id.*)

---

[3] A *Sirois* hearing is available under New York law in order for a prosecutor "to determine whether the defendant has procured a witness's absence or unavailability through his own misconduct, and thereby forfeited any hearsay or Confrontation Clause objections to admitting the witness's out-of-court statements." *Cotto v. Herbert*, 331 F.3d 217, 225-26 (2d Cir. 2003).

On June 21, 2018, counsel for Mr. Joseph filed a petition for a writ of *habeas corpus* in the U.S. District Court for the Northern District of New York, focused solely on the prosecution's statements during trial about alleged gang affiliation.  (Case No. 19-cv-2250, Supp. Pet.)  On June 25, 2018, Respondent opposed Mr. Joseph's petition.  (Case No. 18-cv-1877, ECF No. 7, Response to Order to Show Cause.)  On June 29, 2018, the petition filed in the Northern District of New York was transferred to this court, and it was subsequently consolidated with Mr. Joseph's *pro se* petition.  (Case No. 19-cv-2250, ECF No. 2, Decision and Order Transferring Case; May 13, 2019 Scheduling Order.)  The court then allowed counsel for Mr. Joseph to file a reply to Respondent's opposition.  (Case No. 19-cv-2250, May 13, 2019 Scheduling Order; ECF No. 7, Reply in Support of Petition for a Writ of *Habeas Corpus*.)

## Legal Standard

Pursuant to Section 2254, a district court shall issue a writ of *habeas corpus* to an individual in state custody "only on the ground that he is in custody in violation of the Constitution or law or treaties of the United States."  28 U.S.C. § 2254(a).  A district court may only issue such a writ if the state court adjudication (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme

Court of the United States"; or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see also Lindstadt v. Keane*, 239 F.3d 191, 198 (2d Cir. 2001).

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), claims brought in *habeas* petitions that were adjudicated on the merits in state court are not to be disturbed unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *see Sellan v. Kuhlman*, 261 F.3d 303, 308 (2d Cir. 2001) (the AEDPA "mandates deference to state court decisions").

## Discussion

The court will address each of Mr. Joseph's asserted grounds for relief in turn.

## I.    Ground One: The Photo Array and Lineup Identifications

Mr. Joseph argues that the photo arrays used by the police during their investigation, which were referenced at trial during the testimony of Mr. Leslie and Mr. Byrd, were suggestive because they "depicted [Mr. Joseph] sporting a cornrows/braids type hairstyle while every single other [photo depicted a person with] a low haircut close to the scalp."

(Pet. at 5.)  Mr. Joseph further argues that he was the only
person "wearing jail-issued slip-on shoes with no laces."  (*Id.*)
It appears that this latter argument about Mr. Joseph's shoes
relates to the live lineup that was shown to Mr. Byrd, rather
than to the photo array, because the photos used in the photo
array did not show any of the individuals' shoes.  Respondent
provided this court with the photo array and photographs of the
live lineup.  (*See* Case No. 18-cv-1877, ECF No. 9, Ex. H.)

Mr. Joseph's arguments were rejected by the Appellate
Division, which held that "[t]he photos in the photo array
depicted people who were sufficiently similar to [Mr. Joseph] in
appearance so that there was little likelihood that [Mr. Joseph]
would be singled out for identification based on particular
characteristics," and that the "alleged variations in appearance
between [Mr. Joseph] and fillers in the lineup were not so
substantial as to render the procedure impermissibly
suggestive."  *Joseph*, 145 A.D.3d at 917.  This court must afford
deference to the state appellate court's decision.  *See Sellan*,
261 F.3d at 308.

"[C]onvictions based on eyewitness identification at
trial following a pretrial identification by photograph will be
set aside on that ground only if the photographic identification
procedure was so impermissibly suggestive as to give rise to a
very substantial likelihood of irreparable misidentification."

14

*Simmons v. United States*, 390 U.S. 377, 384 (1968).  A photo "array must not be so limited that the defendant is the only one to match the witness's description of the perpetrator." *United States v. Maldonado-Rivera*, 922 F.2d 934, 974 (2d Cir. 1990).  These same standards apply when a live lineup is used.  *See Simmons*, 390 U.S. at 382-84.

Mr. Joseph contends that "[o]ne of the prosecution's witness's prior description of [the] assailant was that he had cornrows." (Pet. at 5.)  If the only description that a witness provided about the assailant was that he had cornrows, and police then showed the witness an array in which only one person had cornrows, such an array would likely have been too suggestive.  *See Raheem v. Kelly*, 257 F.3d 122, 134 (2d Cir. 2001) (identification procedure "is unduly suggestive as to a given defendant if he meets the description of the perpetrator previously given by the witness and the other lineup participants obviously do not").  Mr. Leslie's description of the assailant, however, was not merely that he had cornrows. The detective who conducted Mr. Leslie's review of the photo array testified at a pretrial hearing that Mr. Leslie indicated that "he knew [Mr. Joseph] because he went to school for two years with him, and that he was a Haitian guy, and that he had corn rows when he shot [the victim], but he [had] since cut his hair to a low cut." (May 4, 2010 Transcript, at 6.)  Mr. Leslie

thus indicated that he knew Mr. Joseph, and that Mr. Joseph shot the victim, before he was ever shown a photo array.  And although he told police that Mr. Joseph had cornrows at one time, he also stated that Mr. Joseph no longer did.  Therefore, it was not unduly suggestive for the police to provide Mr. Leslie with a photo array of six men of similar age and similar skin tones, even though only one of them had a particular hairstyle.  *See Jarrett v. Headley*, 802 F.2d 34, 41 (2d Cir. 1986) ("It is not required . . . that all of the photographs in the array be uniform with respect to a given characteristic.").

Regarding Mr. Byrd's identification of Mr. Joseph during a live lineup, this court has reviewed the photographs of the lineup provided by Respondent.  The six men in the lineup all wore similar hats and shirts, although their jeans varied in color, as did their shoes.  (*See* Case No. 18-cv-1877, ECF No. 9, Ex. H.)  None of the clothing appears to obviously indicate that any of them were in prison, including Mr. Joseph's "slip-on shoes with no laces." (Pet. at 5.)  His shoes appear inconspicuous and unlikely to draw any particular attention.

Moreover, even if the shoes worn by Mr. Joseph during the lineup were suggestive, "an identification premised on a suggestive [procedure] may be admissible if the 'witness's in-court identification of the defendant has reliability independent of the unduly suggestive identification

16

procedures.'"  *Velazquez v. Poole*, 614 F. Supp. 2d 284, 300
(E.D.N.Y. 2007) (quoting *Raheem v. Kelly*, 257 F.3d 122, 134 (2d
Cir.2001)).  Like Mr. Leslie, Mr. Byrd knew Mr. Joseph prior to
identifying him to police.  Mr. Byrd testified that he had "seen
[Mr. Joseph] in the neighborhood," and "had a few run-ins [with]
him" prior to witnessing the shooting.  (Trial Tr. at 94.)  Mr.
Byrd testified in open court that Mr. Joseph, whom he knew, was
the individual who shot the victim (*see* Trial Tr. at 104-05,
109-12), and so any defect during the lineup ultimately did not
affect the outcome of Mr. Joseph's case.

Accordingly, there was "nothing inherently prejudicial
about the presentation" of the photo array or the live lineup.
*Maldonado-Rivera*, 922 F.2d at 974.  Mr. Joseph's ground for
relief based on the photo array and the lineup is, therefore,
respectfully denied.

## II.   Ground Two: Failure to Instruct as to the Lesser-Included Offense

Mr. Joseph contends that his rights were violated
because the state trial court denied his request to instruct the
jury regarding second-degree manslaughter.  (Pet. at 6.)  Under
New York law, first-degree manslaughter requires a defendant to
act with intent to cause serious physical injury, whereas
second-degree manslaughter requires the defendant to act
recklessly.  N.Y. Penal Law §§ 125.15, 125.20.  The Appellate

Division rejected this argument during Mr. Joseph's appeal,
holding that "[t]here was no reasonable view of the evidence,
looked at in the light most favorable to [Mr. Joseph], that
would support a finding that he acted recklessly, rather than
intentionally, in causing the victim's death." *Joseph*, 145
A.D.3d at 917.

"The Supreme Court has held that due process requires
a trial court to submit jury instructions regarding lesser-
included offenses in capital cases," but "has expressly declined
to consider whether such a requirement would apply in the non-
capital context." *Jones v. Hoffman*, 86 F.3d 46, 48 (2d Cir.
1996); *see McNeil v. Capra*, No. 13-cv-3048, 2019 WL 1897750, at
*2 (S.D.N.Y. Apr. 29, 2019) ("The Supreme Court and the Second
Circuit have expressly declined to consider whether due process
requires a trial court to submit jury instructions regarding
lesser-included offenses in non-capital context cases.").  Thus,
this court cannot find that the state trial court's failure to
submit the lesser-included offense to the jury violated the
Constitution.  Any decision that the Constitution requires the
submission of the lesser-included offense in a non-capital case
"would involve the announcement of a new rule," and the Second
Circuit has held that courts are "preclude[d]" from considering
the issue on *habeas* review. *Jones*, 86 F.3d at 48; *see Ortiz v.
United States*, No. 18-cv-4407, 2019 WL 3997379, at *8 (E.D.N.Y.

Aug. 23, 2019) ("Therefore, as this is a non-capital case, the trial court's refusal to provide a jury instruction as to a lesser-included offense is precluded from *habeas* review.").

Accordingly, Mr. Joseph's second ground for relief based on the failure of the trial court's failure to instruct the jury as to second-degree manslaughter is respectfully denied.

**III.    Ground Three: Prosecutor's Statements Regarding Alleged Gang Affiliation**

Mr. Joseph next contends that his due process rights were violated by the "prosecutor's repeated attempts to elicit testimony regarding Petitioner's supposed gang affiliation." (Supp. Pet. at 14; *see* Pet. at 8.)  On appeal, the Appellate Division held that "[t]he prosecutor's questions and comments, even if improper, were not so egregious as to have deprived the defendant of a fair trial," and "[a]ny prejudice resulting from the prosecutor's reference to [Petitioner]'s gang membership was alleviated by the [trial c]ourt's curative instruction." *Joseph*, 145 A.D.3d at 917.

It is clearly established federal law that a prosecutor's comments at trial can violate a defendant's rights if the comments "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v.*

*DeChristoforo*, 416 U.S. 637, 643 (1974)); *see Parker v. Matthews*, 567 U.S. 37, 45 (2012) (recognizing *Darden* as "clearly established Federal law").

During Mr. Byrd's testimony, Mr. Byrd testified about his own gang affiliation. (Trial Tr. at 88-89.) The prosecutor asked about the gang affiliation of the spectators in the courtroom, but the judge sustained the defense's objection to that question. (*Id.* at 91-92.) The prosecutor asked if Mr. Byrd was nervous, the judge overruled the defense's objection to that question, and Mr. Byrd answered that he was not. (*Id.*) Later in his testimony, Mr. Byrd testified that the victim was also a member of a gang. (*Id.* at 93.) The judge did not provide a limiting instruction at any point during this line of questioning.

The prosecutor also asked Mr. Leslie if the spectators in the courtroom were members of a gang, but the judge sustained the defense's objection. (*Id.* at 256-57.) The prosecutor asked Mr. Leslie how he felt about testifying, and Mr. Leslie said it was "not something [he] want[ed] to do." (*Id.*) The prosecutor asked why Mr. Leslie did not want to testify, but the court sustained the defense's objection. (*Id.*) Again, although the court sustained certain objections, it did not provide a limiting instruction. Mr. Leslie subsequently testified that he did not see the shooting, and that he "lied" to detectives about

Mr. Joseph's involvement in it.  (*Id.* at 299, 303-04.)  The prosecutor suggested that Mr. Leslie changed his story "in the presence of a whole bunch of Crips," and the judge sustained the defense's objection to the prosecutor's statement and instructed the jury to "[d]isregard it."  (*Id.* at 300-01.)

The detective who conducted the lineup during which Mr. Byrd identified Mr. Joseph testified, and in response to a question from the prosecutor about what type of case the shooting was, stated that it "was probably a gang case," and that it "originated in the gang bureau."  (*Id.* at 378.)  The judge instructed that those comments be "[s]tricken."  (*Id.*)

To determine whether the prosecutor's statements "so infect[ed] the trial with unfairness as to make the resulting conviction a denial of due process," *Darden*, 477 U.S. at 181, federal courts in criminal appeals consider 1) the "severity" of the prosecutor's behavior, 2) the "measures adopted" to cure the behavior, and 3) the "certainty of conviction absent" the behavior, *United States v. Elias*, 285 F.3d 183, 190-92 (2d Cir. 2002).  The court will consider each of these three factors here.

First, the prosecutor's repeated attempts to invoke the alleged gang affiliation of Mr. Byrd, the spectators in the courtroom, and, implicitly, Mr. Joseph, was severe behavior, particularly in light of the trial court's order that evidence

of Mr. Joseph's alleged gang affiliation would be "more prejudicial than probative," and its finding that there was "no evidence that the offense was due to gang affiliation." (June 17 Tr. at 3.) This was not a case where the prosecutor made a one-off "remark [that] appear[ed] to have been an aberration in an otherwise fair proceeding." *United States v. Melendez*, 57 F.3d 238, 241 (2d Cir. 1995). Rather, the prosecutor repeatedly made "improper suggestions, insinuations, and, especially, assertions of personal knowledge [that were] apt to carry much weight against the accused when they should properly carry none." *United States v. Burse*, 531 F.2d 1151, 1154 (2d Cir. 1976). "[M]ost of the cases in which [the Second Circuit] ha[s] reversed convictions as a result of prosecutorial misconduct . . . involved repeated improper statements whose aggregate effect was more likely to undermine the fairness of the trial." *Melendez*, 57 F.3d at 241. Mr. Joseph argues that the statements in this case plausibly fall into that category.

Second, the trial court attempted to limit the potential harm of the statements by sustaining certain of the defense's objections, and ordering certain of the prosecutor's statements and the detective's testimony to be stricken. The judge, however, never instructed the jury that it should not consider the alleged gang affiliation of Mr. Joseph, even though the detective clearly suggested, prior to the court's order to

22

Case 1:18-cv-01877-KAM-LB   Document 12   Filed 09/22/20   Page 23 of 32 PageID #: 1636

strike the testimony, that the shooting was gang-related. Though sustaining certain objections "undoubtedly helped to blunt any potential prejudice, . . . a more emphatic curative instruction would have been appropriate under the circumstances." *Id.* at 242; *see also United States v. Friedman*, 909 F.2d 705, 710 (2d Cir. 1990) ("In those cases where a prosecutor's improper remarks have not been deemed prejudicial, the record has disclosed emphatic curative instructions by the trial judge.").

Finally, the court considers whether Mr. Joseph's conviction would have been certain in the absence of the prosecutor's improper statements. As set forth below, a reasonable jury still could have convicted him, even in the absence of the prosecutor's statements. Mr. Byrd, who testified that he witnessed the shooting firsthand, and who was familiar with Mr. Joseph prior to the shooting, directly implicated Mr. Joseph in it. Mr. Joseph argues that Mr. Byrd's credibility was questionable because he received favorable treatment on charges related to a home invasion robbery pursuant to a cooperation agreement with the police. (Supp. Pet. at 16.) Even so, Mr. Byrd was not the only witness who implicated Mr. Joseph. A police officer testified at trial that Mr. Joseph confessed to shooting an individual in a park while the police officer was undercover. (Trial Tr. at 445.) Mr. Joseph notes that this

23

conversation was not recorded, even though the police officer testified that he often recorded conversations while he was undercover engaging in drug transactions. (Supp. Pet. at 3-4.) It is also noteworthy that Mr. Leslie's earlier identification of Mr. Joseph may have been given more weight by the jury in light of the prosecutor's improper suggestion that he was only changing his story because of the presence of the alleged gang members in the courtroom.

Based on the entire record, the court finds that although many of Mr. Joseph's contentions regarding the credibility of the evidence against him are plausible, his conviction, though not certain in the absence of the prosecutor's gang-related statements, was still highly likely based on the evidence at trial. The jury could have found Mr. Joseph guilty based on Mr. Byrd's testimony and the undercover police officer's testimony alone. *See Melendez*, 57 F.3d at 242 (conviction was not "certain in the absence of the prosecutor's misconduct, though it was highly likely" where the prosecution's case consisted "almost entirely of the testimony of two accomplice witnesses who had entered into cooperation agreements with the Government, one of whom was an admitted perjurer," where "their testimony was bolstered by its consistency with several circumstances, established by independent evidence").

The court is also mindful of its role in reviewing this case.  Unlike the cases in which the Second Circuit considered a prosecutor's statements on appeal following a federal criminal conviction, Mr. Joseph's case comes to this court on a petition for *habeas* relief.  The state trial court found that, although the prosecutor's statements were "improper," the statements were about "the audience" rather than about Mr. Joseph.  (Trial Tr. at 516.)  On appeal, Mr. Joseph's conviction was upheld.  Mr. Joseph concedes that the state court's determination is entitled to deference under the AEDPA. (*See* Supp. Pet. at 14-15.)  Mr. Joseph further concedes that there is no federal case with similar conduct by a prosecutor in which a court overturned a conviction.  (*Id.* at 15.) Accordingly, on the record before the court, the court cannot find that the state court's determination should be disturbed, as it was not "contrary to," nor did it "involve[] an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  Given the other evidence against Mr. Joseph, his conviction still would have been reasonable given the amount of discretion and deference afforded to the credibility determinations made by juries.

Accordingly, Mr. Joseph's third ground for relief, based on the prosecutor's repeated references to supposed gang

affiliation, is respectfully denied.  However, because "jurists
of reason could disagree with [this] court's resolution of [Mr.
Joseph's] constitutional claim[]" on this ground, *Miller-El v.
Cockrell*, 537 U.S. 322, 327 (2003), the court will issue a
certificate of appealability to allow Mr. Joseph to pursue this
claim before the United States Court of Appeals for the Second
Circuit, if he chooses to do so.

**IV.     Ground Four: Trial Court's Readback of Testimony in
          Response to a Jury Question**

Mr. Joseph next argues that the trial judge "read back
the most prejudicial interpretation there was" of Mr. Byrd's
testimony in response "to an ambiguous note from the jury."
(Pet. at 9.)  Mr. Joseph argues that the court only read back
Mr. Byrd's direct examination testimony, but that it also should
have read back his testimony from cross-examination.  (*Id.*)

The relevant question from the jury came to the judge
after deliberations began.  It read: "Portion of testimony
describing the fight between [the victim] and the defendant,
distance between the punch and the shot from Joshua Byrd."
(Trial Tr. at 630.)  Defense counsel argued that this question
referred to the distance between Mr. Byrd and the shooter at the
time of the shooting.  (*Id.* at 638.)  The judge interpreted the
question to refer to the distance between the shooter and the
victim at the time of the shooting.  (*Id.* at 638-39.)  When the

judge posed his understanding to the jury, he saw "a lot of
heads nodding yes" and the "[f]oreperson s[aid] yes," but he
suggested that the jury could submit another note if it had
further questions.  (*Id.* at 639-40.)   The judge then had the
court reporter read back the portion of Mr. Byrd's direct
testimony during which he described the distance between Mr.
Joseph and the victim.   (*Id.* at 640.)

Mr. Joseph's argument appears to be based on New York
Criminal Procedure Law, which directs that "the jury may request
the court for further instruction or information with respect to
the law, with respect to the content or substance of any trial
evidence, or with respect to any other matter pertinent to the
jury's consideration of the case," and that "the court must
direct that the jury be returned to the courtroom and, after
notice to both the people and counsel for the defendant, and in
the presence of the defendant, must give such requested
information or instruction as the court deems proper."   N.Y.
Crim. Proc. Law § 310.30.   State courts have held that defense
counsel must be given "meaningful" notice of the jury's inquiry,
and the court must provide the jury a "meaningful" response.
*See People v. O'Rama*, 78 N.Y.2d 270, 276 (N.Y. 1991).   The
Appellate Division considered this issue on appeal and held that
"the [trial c]ourt gave a meaningful response to the jury's

request for a readback of the testimony of a prosecution witness." *Joseph*, 145 A.D.3d at 917.

There was nothing in the Appellate Division's decision that was contrary to, or an unreasonable application of, federal law.  The question appears to be one purely of state criminal procedure.  The jury asked for a readback of a certain portion of Mr. Byrd's testimony, the trial judge confirmed which portion they wanted, and directed the court reporter to provide a readback of the requested testimony.  There is no state or federal law requiring that additional testimony be read back in response to a jury request for a specific portion of testimony. *See United States v. Criollo*, 962 F.2d 241, 243 (2d Cir. 1992) ("Our decisions have emphasized that a court's response to a jury request for a readback should balance the jurors' need to review the evidence before reaching their verdict against the difficulty involved in locating the testimony to be read back, the possibility of undue emphasis on a particular portion of testimony read out of context, and the possibility of undue delay in the trial.").

Accordingly, Mr. Joseph's fourth ground for relief, based on the court's readback of a portion of Mr. Byrd's testimony to the jury, is respectfully denied.

V.      **Ground Five: Ineffective Assistance of Counsel for Failure to Request *Sirois* Hearing**

Mr. Joseph's final contention is that his trial counsel rendered ineffective assistance of counsel by failing to request a *Sirois* hearing after Mr. Leslie "changed his testimony," and the prosecution "was allowed to read into the record as evidence, in the presence of the jury, [Mr. Leslie]'s prior uncontested, unchallenged, out-of-court statement . . . ." (Pet. at 16.)

The Appellate Division, Second Department's decision in *People v. Sirois* involved a defendant who "influenced [a witness's] decision to change her testimony and to disappear." 92 A.D.2d 618, 618 (2d Dep't 1983).  Courts in New York have held that in such instances, prosecutors may move for "a hearing . . . to determine whether the defendant has procured a witness's absence or unavailability through his own misconduct, and thereby forfeited any hearsay or Confrontation Clause objections to admitting the witness's out-of-court statements." *Cotto*, 331 F.3d at 225-26.  The Second Department considered Mr. Joseph's argument on appeal, and held that "a *Sirois* hearing was not relevant to the circumstances of [Mr. Joseph's] case," because such a "hearing is a tool used by the prosecution . . . ." *Joseph*, 145 A.D.3d at 918.

In reviewing an ineffective assistance of counsel claim raised in a *habeas* petition, courts apply the "highly demanding" standard set forth in *Strickland v. Washington*, 466 U.S. 688 (1984). *See Kimmelman v. Morrison*, 477 U.S. 365, 382 (1986). The court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," and "[j]udicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 89. Under *Strickland*'s two-prong test for ineffective assistance of counsel, *habeas* petitioners must demonstrate (1) that "counsel's representation fell below an objective standard of reasonableness," and (2) that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 688, 703.

Mr. Joseph cannot meet either prong of the *Strickland* test, because, as the Appellate Division held on appeal, a *Sirois* hearing could only have been requested *by the prosecution* if it suspected that Mr. Joseph caused Mr. Leslie to change his story. There was no action Mr. Joseph's counsel could have taken to prevent the admission of Mr. Leslie's prior statements, and the admission of those prior statement did not violate Mr. Joseph's constitutional rights. Under federal law, "[a] witness's prior statement may be offered to impeach that

30

witness's credibility if (1) the statement is inconsistent with the witness's trial testimony, (2) the witness is afforded an opportunity to deny or explain the same, and (3) the opposing party is afforded the opportunity to cross-examine the witness thereon." *United States v. Strother*, 49 F.3d 869, 874 (2d Cir. 1995). These criteria were met here, as Mr. Joseph's counsel vigorously cross-examined Mr. Leslie about why he made the prior statement to the police. (*See* Tr. at 301-04.) Therefore, Mr. Joseph's rights were not violated by the admission of Mr. Leslie's prior statement, nor was his counsel ineffective.

Accordingly, Mr. Joseph's final ground for relief, ineffective assistance of counsel, is also denied.

## Conclusion

For the foregoing reasons, both of Mr. Joseph's Section 2254 petitions are DENIED and dismissed in their entirety. A certificate of appealability is granted with respect only to Mr. Joseph's claim that the prosecutor engaged in misconduct that violated Mr. Joseph's due process rights by posing questions to witnesses regarding alleged gang affiliation. Because Mr. Joseph has not made a substantial showing of the denial of a constitutional right with respect to his other asserted grounds for relief, a certificate of appealability is denied and shall not issue as to those grounds. *Miller-El*, 537 U.S. at 327 (discussing certificate of

appealability standard); Rules Governing Section 2254 and 2255 Cases, Rule 11 ("The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant.").

The Clerk of Court is respectfully directed to enter judgments in favor of Respondent in case number 18-cv-1877 and case number 19-cv-2250, serve a copy of this Memorandum and Order upon Mr. Joseph, note service on the docket, and close both cases.

**SO ORDERED.**

Dated:    Brooklyn, New York
          September 22, 2020

                                    _____/s/_____
                                    Hon. Kiyo A. Matsumoto
                                    United States District Judge